Good morning, Your Honors. John Balistrieri for Plaintiff Appellant Farallon using the court shorthand. Farallon and Cargill Financial and Carvel entered into a joint venture to develop a project in Cabo San Lucas, Mexico. That's where the claims in this suit come from. There is a series of contract claims for breach of that joint venture, which should be interpreted under Mexican law, but even under New York law, contrary to the district court's decision, we do plead the who, what, when, where, and why. And I can discuss that, though, of course, we do in the papers. But there's also a series of Mexican law torts, which we adequately plead here. And that is important to remember, that we are at the pleading stage here. With regards to the choice of law analysis, the district court erred in two ways. First, she did not review the torts choice of law analysis at all. Instead, the district court applied the groupings or the center of gravity analysis, which does apply under New York law under Schultz, to a contract claim. But even under the contract claim, where you look to see what the subject was of the contract, it's in Mexico, where the domiciliaries are, the plaintiff is in Mexico, the others are in a few different places, and even where the conduct took place. And we plead, and there's no evidence to the contrary, we plead that virtually all of the conduct took place in Mexico. Is the violation of the duty of good faith a tort? Under Mexican law, it is, Your Honor. It is. So this is a key point. We are not bringing that under New York law, where it's frankly doesn't give a lot, I think, to a plaintiff. A breach of good faith claim essentially just says that a plaintiff is supposed to get the fruits of the contract to which they agreed. Whereas under Mexican law, and this court noted this in the Curley decision in 1995, torts are very different. There is this very high ---- But you are relying on 1910, this provision? Section 1910, as well as Section 1796, yes, Your Honor. Could you point to me where in your complaint you even refer to 1910? I don't believe that we do. You just generally rely on Mexican law? No. And certainly in the briefing, we put forth 1910, not just before this court, but before the district court. And obviously, we submitted two expert reports of Mexican law experts, which said, and they provided no expert authority to the contrary, that these complaints would allege a violation of these kinds of torts under Mexican law. And they take issue with the conclusions of the two experts, but nonetheless do not provide an expert affidavit themselves upon which the district court could rely. As the Court knows, Judge Schindler didn't even get to that because she said that New York law applies. But again, she used the wrong choice of law analysis for the torts, not even getting to the correct interest analysis, when the under that, clearly, it should be Mexican law, which applies to the tort claims. And even with regards to the breach of joint venture, to be sure, we do adequately plead the who, what, when, where, and why under ---- that the parties had agreed to the sharing of profits and losses. We, under beginning of paragraph 44, Your Honor, to 60, is where we talk about what it was that they were going to do. I don't know if there's actually in there sharing profits and losses. I didn't see it. Isn't that a problem? But that is nonetheless what they, what the ---- I don't know. But if it isn't alleged, isn't that critical to whether there you've alleged a implied joint venture? But then that would be something which could be affixed on an amendment, Your Honor, because I believe that reading the complaint, the Farallon and Cargill did not enter into this for any reason other than to engage in a profit business, which under Mexican law is the key aspect, that they're entering into some kind of business relationship. And if so, then under, according to Professor Vargas, and we cite to the treatise and the papers here, under Mexican law there is a breach of a, there is a joint venture. And then starting at paragraph 128, we allege what was a breach of that. They have, Farallon has not gotten any money from this, has not had any access to the property. Its individuals have been ejected. It has no, none of the books and records. And the manager, which had a relationship with Farallon, was terminated. This is a business relationship. So even if that were an issue, Your Honor, I believe that the complaint shows that this was a profit-sharing or law-sharing venture. Breyer. You mentioned Mr. Vargas, and unfortunately I had to do a little digging into Mexican law, and I find myself scratching my head at that exercise. But there is a, well, no, you can blame the Federal rules for that. But there is a 2009 edition of Vargas that says that the joint venture contract must be in writing. I'm not familiar with that, Your Honor. But there, I mean, I would need to see that. Quite frankly, I'm not sure of it. I'll try to look. You rely on an earlier edition of Vargas. This 2009 edition specifically says that. And there are references to Article 254 of the commercial code that seem to also require the joint ventures be in writing. But you're not aware of any of those things. I'm not at this point, Your Honor, and I'm sorry that I had the wrong authority there, if I did. But even still. Well, if that is correct, assume for now that I've read the 2009 edition of Vargas correctly, then how do you prevail on your contract claim? If that is correct and Mexican law were to apply, we have a problem. Under New York law, we actually don't need a writing. So if Judge Schindler were correct and New York law were to apply to the breach of joint venture claims, the contract claims, then we do adequately allege enough, because under New York law, you do not need to have a writing for an implied-in-fact contract. That's, in fact, the point, is that there is not a writing. And under the Beth Israel decision, this Court has said an implied-in-fact. If I understand your position, maybe I missed this. Even though you took the position in your brief that Mexican law should apply to both the contract and the tort claims, if it turns out Mexican law doesn't favor your position, then you want to apply New York law? No. I mean, I guess that would be nice if it worked that way, Your Honor, but I know it doesn't. What I'm saying is I think Mexican law. One might suggest that's a little hypocritical. Yeah. And that's not what I'm saying, Your Honor. I think Mexican law applies, and forgive me, Judge Lawyer, I'm not familiar with that authority, so I would need to look at it and ask for the opportunity to submit a letter to the Court regarding that, if that is possible. First edition, 2009. Okay. 221. Thank you, Your Honor. Do I have permission to submit a letter regarding that? Why don't you submit the letter by a week from today, and your adversary will have a week to respond, no more than three pages. Thank you, Your Honor. Can I just ask a question about the tortious interference claim? Did I hear you to say that the experts, your experts, addressed that under Mexican law? Because I don't recall seeing that reference. No, and I'm sorry, the tort claims, Your Honor, not the tortious interference, but the Mexican tort claims, claims which don't exist here, or rather don't exist under our New York law, but which we are asserting here. And both Mr. Von Wobiser and Mr. Torres opine that the complaint alleges violations of such torts. They make an issue in their papers saying, well, these are commercial torts, but there's no authority for the proposition that commercial torts are to be treated differently and taken our pleading at the pleading stage. There are allegations sufficient that we have pleaded these if Mexican law were to apply, and under the proper choice of law analysis, Mexican law does apply. I do want to make one thing clear because Judge Shindlin rests on this trust governance agreement, the TGA. That simply doesn't apply, and we get into reasons why in our papers. But the key reason is that that was between Farallon and one of the members of the so-called Cargill Group that's their word or their term. But that member isn't here. McZavallo is not here. Farallon could not have sought to bring claims against Cargill Financial and Carval in an arbitration. The Cargill Group has not acted as if it is bound by that. In fact, they initiated the first lawsuits in New York Supreme Court such that they clearly did not believe that the arbitration would be the be-all, end-all that Judge Shindlin found that it was. And here, it's essential because if there was a waiver provision, an integration clause, and New York law applied, though again I'm saying Mexican law applied, we would have had to go to arbitration. But we couldn't, meaning Farallon couldn't, in claims it had against Cargill Financial and Carval because that involved this single-purpose entity, McZavallo. And again, a member of the group. McZavallo was created, I mean, it is entirely a creature of Cargill. Correct, Your Honor. It is. But Cargill SOFOM, S-O-F-O-M, there's a lot of Cargill entities. That's another creature of Cargill. They brought an action in New York Supreme Court. They did so under a separate agreement which had a particular provision that said that claims under that guarantee need to proceed in the State court, which shows that there were different entities which maybe were restricted as to where they could bring their claims. But the idea that Farallon somehow gave up its rights really to seek any relief at all against Cargill Financial and Carval is not supported by the record. And indeed, Cargill SOFOM even sued an individual principal of Farallon in the New York Supreme Court. There's no agreement that says that. Cargill is showing that it can go to the courts to seek relief. But here, Judge Shindlin said, no, this integration clause, notwithstanding the fact that neither Cargill Financial nor Carval agreed to it. Robertson, on the tort claim, would you tell me, and maybe you don't have an answer immediately, whether 1910 has been applied by or in Mexico or by any Federal court to noncontractual business relationships? I'm sorry. So to noncontractual business relationships, because both of your experts, and particularly Mr. Von Wobeser, references business relationships in the context of this tort. We don't have authority. I don't believe in that. And I'm not sure if a Federal court, a U.S. Federal court has, Your Honor. I am certainly aware that this is applied in the business context. But that is what we have here. Do you mean whether there was not already a contract? Well, the point is that it applies regardless of whether or not there's an actual contract. The language talks about legal relationships, not simply a relationship where there is a contract. And again, this Court in Curley said that Mexican torts can apply. That was a noncommercial case. But nonetheless, there wasn't a contract. Yet this Court found that there could be a violation of good customs under Mexican law, and that is the — those are the kinds of torts which we're bringing here. So I must say that my own reading, again, it's very limited, is that 1910 seems to be very limited to the personal injury type of context. And I'm not aware of a case where it's applied in this context. Well, in Mexico, cases are sealed, generally. So, I mean, I can say that I'm personally aware that they bring these. This is not in the record because it's my own knowledge, having spoken to Mexican counsel. But Mr. Torres doesn't restrict his opinion that there are torts here to — he says that there would be torts here. I mean, this is — Mr. Von Wolberstow doesn't opine on this as directly, but Mr. Torres does. And they take issue with his opinion, but they don't provide this Court with Mexican law authority to the contrary. And Judge Schindlin herself at one time said if there really was going to be, you know, dueling Mexican law experts, maybe she would need a hearing on it. But certainly at the pleading stage, with no authority to the contrary, we should be able to proceed. And if they want to raise this issue on summary judgment, then that would be a different  And then Judge Schindlin, on the first motion to dismiss, essentially said that, that they were making summary judgment arguments. But the authority before this Court, with the opinions presented to this Court by Mexican law authorities, Mexican law experts, who have practiced in the commercial context — and I ask Your Honor to look at that — both Mr. Von Wolberstow and Mr. Torres are commercial lawyers. Mr. Torres actually practiced with Dewey Ballantyne here for a few years. He's not a personal injury lawyer, nor is Mr. Von Wolberstow. They're commercial lawyers. And these are claims which are brought in a commercial context in Mexico. I have reserved time for rebuttal. Thank you, Your Honor. MR. VERRILLI, JR.: Good morning. May it please the Court. Michael Verdi for Appellee Cargill Financial. A few points that we could not bring out in the briefs regarding — because of timing issues. One of the concerns of a district court or an appellate court reviewing a motion to dismiss is that the court may be denying a plaintiff their day in court. It's a very understandable concern. Here, as you've heard, Farallon has brought into this case, also through their Rule 59 and 60 motions, the fact that there was a parallel ICC arbitration pending. The ICC arbitration was between Farallon and Mexfalo, the entity that Cargill created in order to hold this interest in Mexico. In that arbitration, Farallon raised the same arguments, the same claims, the same damages, the same theories of Mexican law that they did here. The case went, as should be obvious from the fact that they were citing from witness testimony, the case went through a full two-week hearing and there was a decision. So they have had their day in court. If the court denies — if the court affirms the district court's opinion, they will not be denying this party their day in court. They will be denying them a second bite at the apple, only through different parties. Throughout this, Farallon, and even now, has not addressed the Rule 8 pleading inadequacies. The standards of ICBAL are pretty clear. Judge — the district court numerous times warned them, gave them an opportunity to replead after pointing out the deficiencies, and still they could not fix them. That is why the district court ultimately found it would be futile to give them one more try. The fact of the matter is, is that they had no details of this joint venture, because the more they talked about this supposed implied joint venture, the more it became clear they were talking about a trust governance agreement, a trust agreement between Mexfalo and Farallon that actually embodied the party's intent on how they were going to develop, manage, and own this property. So any of the details that are in their pleading about this joint venture look exactly the same as what came from the joint venture. They even claimed the joint venture started on the same day that the trust governance agreement was signed. And that led to Judge Scheinlein's second basis for denying this claim, dismissing this claim, which was that the trust governance agreement did not supersede the trust governance agreement, basically precluded any other orderly agreements before or after, because it had a merger and integration clause. One of the questions the district court asked that, again, Farallon never addressed was, even assuming the rest of the law is correct, and it's a highly suspect assumption, where does it say that a Mexican court will not enforce a written agreement like a merger and integration clause, especially since the authorities they cited seem to indicate that Mexican courts will, almost more so than U.S. courts, enforce the specific terms of a written agreement between the parties? They pled the joint venture agreement existed before the trust governance agreement. The trust governance agreement has a full merger and integration clause. Why wouldn't a Mexican court apply that particular clause to prevent the joint venture agreement from being enforced? The district court noted that the Mexican law experts didn't opine on the enforceability of the integration clause, and that in an actual conflict it would go ahead and apply New York law. But the predicate to that conclusion, it seems to me, is that it was the plaintiff's burden at this stage to produce the actual conflict. And is that clear under our law? Yes. It's the plaintiff that has the burden to raise, to carry the issue of whether there is, in fact, a conflict of laws. The Court clearly has the ability and now has the burden of looking further. But there was nothing that the plaintiff could, that Farrellon could show that suggested that this merger and integration clause would not be enforced the same way by a Mexican court as it would be by a U.S. court. And as far as this idea of what Mexican law is, it's a very strange and slippery concept, and we've dealt with it now through four different cases where these same expert opinions have been proffered. It seems to suggest that parties who gather together to form a contract have a common enterprise, have a spirit of cooperation between them. If you follow the logic, that creates in and of itself an implied joint venture that continues to exist even after the parties have reduced their agreement to a specified writing. It's almost like a ghost contract that continues to live after the written contract is formed, despite the fact that there's a merger and integration clause. And what's problematic about that is if you follow that logic, then there's an implied joint venture every time parties are getting together to form a contract. The written agreement is less important, kind of almost vitiates the importance of having a written agreement, because this implied spirit of cooperation that prevailed before the contracts were signed continue with very uncertain terms. They become sort of a Rorschach inkblot of whatever you want to see into them, whatever you happen to need at the time. And then if you don't have an actual breach of the contract, you can go back and say, well, this breaches the spirit of cooperation that we were all engaged in before we signed these contracts, except I'm now giving it a legal name, an implied joint venture. Mexico, this is a very distorted reading of every resource we've seen, every treatise we've seen in Mexican law. Mexico is a sophisticated commercial country. No commercial country could possibly survive very long where written contracts are constantly superseded by what the parties sort of intended before they contracted. And that's what's going on here. Mexico does not have that law. And I think the district court was convinced that what the plaintiffs, what Farrellon did show, did not indicate anything of that nature. It was, in fact, these were tort claims. And beyond that, still couldn't explain why a Mexican court wouldn't hold the parties to their written agreements. So will you turn to the tort claims? I'm sorry? Will you turn to the tort claims? Well, the tort claims are creatures of contract. And the only tort claim that is a bona fide tort claim is this tortious interference. And that, the district court gave them an opportunity to replete and move forward with, and they declined and chose to pursue the appeal instead. So that, procedurally, I'm not sure where that sits, but that's not been the subject of this appeal. The other tort claims are really breach of good faith, duty of good faith, and breach of duty to avoid conflicts of interest, which, as Vargas says, are only duties that arise in the course of having a contract. So if you're unable to prove the existence of a binding and enforceable contract, those other. You're saying that those are really implied terms of every contract, and therefore the breach of the duty of good faith, for example, is a quasi-contractual breach, not a tort. Even the most extreme. Yes, that's right, Your Honor. Even the most extreme reading of Mexican law starts with the assumption that whatever the relationship was, it created an implied joint venture, and the implied joint venture then created these duties. So if you can't get past that first step of an implied joint venture, then all of the other quasi-tort claims fall away. The only one that doesn't is tortious interference, which was with a third party, had nothing to do with the actual agreements, but they did not pursue that claim. So your answer to my question to your adversary, which was, is you aware of 1910 applying to or being applied to a noncontractual business relationship is no? No. That is correct, Your Honor. And with that, I think I would just leave time if the Court had any questions for us about anything that was unclear in our papers or any of the issues that have been raised so far. You can rest on your feet. Thank you. Good morning again, Your Honors. Judge Rakoff, we do mention the fact that this is a paragraph, I think, 37 of the complaint. We don't use the terms profit and loss, but talk about the different ownership interests that there will exist in the joint venture. What paragraph is that? It's at paragraph 37, so to address that particular point. Again, throughout the complaint, we talk about this as a business venture. With regards to the arbitration, this is not before this Court anyway, but to address it since it came up, they're not the same claims. They're only against McFarland. If Farrellon would have been able to bring Cargill Financial and Carval into that arbitration, this would be a different discussion, and then everything could have been resolved there. The notice of claim for the arbitration was only brought after this action was brought. So besides the fact that it could be pleading in the alternative, I don't even need to go there, because there were counterclaims brought. They initiated the arbitration. There were some counterclaims against McFarland, but only against McFarland, which is a shell, which they admitted has no money, which only has a sole manager, and is certainly not the party that they entered into all their business relationships with. There's a lot in these papers, but at some point we discuss how it's necessary under Mexican law if there's going to be a real estate project, really any property by the shore or by a border in Mexico, that a trust has to be created. So that's the reason why there was this trust which was created, where they, Cargill, created an entity, McFarland, and that would be, and it would have a technical committee, this trust, and it's kind of like a board of directors, but they created multiple other entities. There's one we mentioned, Hotelus, Hotel with an E-S. There was a management company that was also brought in. They created a lender at some point to take over the loan and then use that to boot their joint venture partner off the property. The arbitration did not cover everything, and bluntly, it's also subject to litigation now because Carval admitted that while the award was pending there, it attempted to hire the chairman of the tribunal for another matter. So that is hardly binding on this court, but I just wanted to get into the Paragraph 37 says Farallon and the Cargill parties agreed that Farallon would hold a majority 55.22% interest in the project, while the Cargill parties would hold the remaining 44.78 minority share. And you say, therefore, that's at least implicit in that, that they would share the profits and losses. Is that your argument? Yes, Your Honor. I mean, I could say that I could plead in good faith right now, thus the parties agreed to share the profits and losses and add that right to that line there. And, again, we're at a pleading because that was the point. They had this interest, and they had to share the profits, and they would have to share any losses, which came from that. And with regards to the last colloquy you have, Counsel, Your Honor, about the breach of good faith being the same, it's not. Again, Curley, that's a decision of this court in 1995, said how these good faith and good customs claims, which they have in Mexico and many other civil law jurisdictions, I know Chile has this, they are different than our understanding of it, where really in New York, without a contract, you don't have, I'm unaware of a breach of good faith claim. I certainly wouldn't recommend a client bring a claim just for that without a contract. Whereas in Mexico, you do have these opportunities for these separate claims. And, Judge Loyer, it's on page four of the Torres affidavit, where there is a reference to a 2011 thesis. So it's after Professor Vargas, and we'll address this in our letter, but I wanted to bring it up now. So this is the bottom of the page where the thesis there says, every person, every member of a legal community must behave in good faith in their reciprocal relationships, not only at a preliminary phase, but also in the development of existing legal relationships. And it goes on. I understand that, but does it cite to anything? Yes. Well, that is not just an opinion. That's a citation to a thesis, which then cited to an amparo, which is a particular proceeding. So this thesis then cites to a case in Mexico that aren't the same common law principles that we have, but nonetheless, a decision of a court can be instructive. Again, I'd need to see how that works with the 2009 Professor Vargas treatise. But the point is, at the pleading stage, they have adequately pleaded their claims if New York law applies. I will address your point, Your Honor, in the letter, because I thought that it did under Mexican law as well. But independent of that, if this Court applies the correct choice of law analysis with regards to the torts, the interest analysis, the Mexican law claims proceed. Let me ask you about the interest analysis, because I'm looking at paragraph 13 of the complaint, which says the allegations against Cargill Financial contained herein arise from its business transactions in New York, including those transactions with Carvel, RHF, and West L.B. How do you square that with your position that under the interest analysis, the interests really lie in Mexico? That was part of the personal jurisdictions allegations, Your Honor. So I'm not saying that there wasn't also business done here. We are not dealing with solely Mexican parties, certainly. Cargill Financial has an interest here as well as in Minnesota, as does Carvel. So I'm not denying that. That's why the claims are brought here, because as opposed to an action against this Shell-Mexvalo, if there's a judgment against Cargill Financial or Carvel, then that is something which can provide Farallon relief. So that right there, because the beginning of that paragraph is— No, it's background as well, certainly. But we do plead how the Carville and the Carval individuals, because that's largely who the employees of Cargill were, they were in Mexico. The contracts were largely written in Mexico. In fact, they are almost all in Spanish and in English. Just pursuing Judge Loehr's point, you could have stopped with what you're now saying about personal jurisdiction. But what you go on to say is, quote, the allegations against Cargill Financial contained herein— you're not saying, you're not limiting at all— the allegations against Cargill Financial contained herein arise from Cargill's financial business transactions in New York. Why isn't that virtually a concession that New York law applies to the contractual claims? Because it doesn't say arise—excuse me, Your Honor, I'm sorry. No, go ahead. Arise solely and only from Cargill Financial's business transactions in New York. We are depleting, and if at the summary judgment stage, it somehow—this would not be the case, I know— it showed that Cargill Financial did nothing to go to Mexico. It didn't send people there. It didn't send money there. It didn't open up bank accounts there. Again, there's some of this later on in the pleading. Then they may have an issue at summary judgment. But at a pleading where this was presented in the context of personal jurisdiction, I'm simply saying that the allegations and the remainder of the complaint show that it was Cargill Financial and Carvel which had its individuals working in Mexico where the subject of the joint venture unquestionably is in Mexico, and where indeed Cargill Financial, to use your term, Your Honor, had these entities which they created in Mexico, such as Mexvalo or Cargill Sofom. And so that if there's going to be an interest— I think that would actually be more full, Your Honor, under the groupings for contract anyway. But if there's an interest analysis under Schultz, the New York Court of Appeals case, the chief concern is where was the harm felt, and the harm was felt by Farallon in Mexico because it no longer even has access to the books and records of a property of which it still is the majority owner. If there are no further questions, thank you very much, Your Honors.